LAS VEGAS HOSPITAL ASSOCIATION, INC., ET AL., APPELLANTS, *v.* EILEEN F. GAFFNEY, RESPONDENT.

No. 3466

May 7, 1947.                    180 P.2d 594.

*Morse and Graves,* of Las Vegas, for Appellants.

*John G. Cope,* of Las Vegas, for Respondent.

## OPINION

By the Court, BADT, J.:

■ Respondent, plaintiff in the court below, recovered damages in this action for alleged negligent treatment of her by appellants in the Las Vegas hospital following the delivery of her child. The trial court entered judgment on the verdict of the jury and denied appellant's motion to vacate the judgment and grant a new trial. The trial court had also denied appellant's motion for nonsuit and had theretofore overruled appellant's general demurrer to respondent's complaint. Appellants appealed from the judgment and from the order denying the motion to vacate the judgment and denying the motion for new trial. They also state in their notice of appeal and their opening brief that they appeal from the order overruling their general demurrer to the complaint, but in this regard see N.C.L., sec. 8885 and Chartz v. Cardelli, 52 Nev. 278, 286 P. 125.

■■ The parties will be referred to as they appeared in the court below. Plaintiff's complaint alleged the existence of Las Vegas hospital association, incorporated, and its purpose of maintaining a hospital at Las Vegas, the status of C. W. Woodbury as a practicing physician maintaining his office at the hospital, her entrance into the hospital on April 10, 1944, for the purpose of being delivered of a child, and as the patient of Dr. Woodbury. Plaintiff then alleged her entry into the hospital, the delivery of her child, her return to her room early in the morning still unconscious from the administration of ether, the fact that one or more hot water bottles heated to high degree and placed in the bed for the purpose of warming it or some other instrumentality in the delivery room had caused a serious burn or injury to her leg; that her leg was normal at the time of her entry into the hospital; that the injury was treated by Dr. Woodbury and the Las Vegas association, incorporated for a long period of time, and that in July of 1944

(the injury or burn not having improved) she went to another hospital for treatment until October of that year, during which time the injury responded to treatment at the second hospital, but that she will bear a permanent scar. It is alleged that the negligent treatment and lack of care on behalf of Dr. Woodbury and Las Vegas hospital association, incorporated, acting by and through its servants, agents and employees, caused the burn or injury. The pleading sets these matters out in considerable detail. Plaintiff alleges that she was unnecessarily subjected to great suffering and anguish, would suffer a permanent scar and was damaged in the sum of $5,000 for which sum she asked for judgment. No lack of medical skill is alleged.

Appellants earnestly contend that the complaint does not state facts sufficient to constitute a cause of action, and that their general demurrer should have been sustained. We think that the complaint contains all of the essential elements in an action for negligence, namely, the existence of a duty on the part of the defendants to protect the plaintiff from the injury of which she complains, the defendants' failure to perform that duty, and a resulting injury to the plaintiff growing out of such failure. Plaintiff's complaint sets out the essential facts of her case with reasonable precision and with sufficient particularity to acquaint the defendants of the nature, source, and extent of her cause of action. The complaint indicates a greater knowledge of the facts on the part of the defendants so that less particularity was required than in other cases. It would appear that the plaintiff set forth what was done with as much particularity as she could considering the nature of her cause of action and her condition when the injury was alleged to have occurred. The generality of the pleading complained of by the appellants would appear to be warranted by the circumstances and the situation of the parties. The foregoing conclusions and similar language found in the great majority of cases dealing with the

sufficiency of a complaint when attacked by general demurrer indicate that the decision of the lower court, overruling the demurrer to the complaint, was proper. 19 Cal.Jur. 666, 671, 672; 1 Bancroft Code Pleading 269; Stephenson v. Southern Pacific R. R. Co., 102 Cal. 143, 34 P. 618, 619; Guilliams v. Hollywood Hospital, 18 Cal.2d 97, 114 P.2d 1, 4; Goldstein v. Healy, 187 Cal. 206, 201 P. 462; Rannard v. Lockheed Aircraft Corporation, 26 Cal.2d 149, 157 P.2d 1.

Evidence upon which the jury was entitled to rely, in returning its verdict, and which the trial judge was entitled to accept in denying defendant's motion to set aside the verdict and vacate the judgment and for a new trial, shows the following situation: Plaintiff had been treated by Dr. Woodbury since October 1943, his treatment consisting of prenatal care in relation to her pregnancy. On April 10, 1944, at about 7:30 a. m. plaintiff entered the hospital and was placed in a private room, prepared for the delivery, and about 10 p. m. Dr. Woodbury performed a rectal examination and had sedatives administered. Plaintiff thereupon was wheeled down the hall to the delivery room and administered ether. Her left leg was entirely normal in all respects at the time. She regained consciousness some time in the morning of April 11 and immediately thereafter felt a pain in her left leg. She complained to one of the nurses, who applied a bandage. The leg was then red in color over an area approximately from her knee in the back of her left leg down to her ankle. Some five or six days later the condition of the leg became worse and blisters appeared thereon. About this time Dr. Woodbury looked at the leg, ordered it redressed and expressed the belief that it would be healed by the time plaintiff was ready to go home. Shortly thereafter the leg had turned a blue color, looked like a deep bruise and had blisters all over it. Her leg became numb in this area. At the time she was dismissed from the hospital the condition had become worse, the leg was deep purple

in color, and the blisters were larger and had water in them. She returned to the hospital each day for treatment under instructions of Dr. Woodbury, and although she constantly inquired as to the cause of her condition, received no answer. During one of such examinations Dr. Woodbury stated that there were no hot water bottles in the delivery room. This was the first mention made of hot water bottles. The leg now looked like raw hamburger, and was very red and purple. On May 15, 1944, 34 days after the discovery of the leg condition, when plaintiff called at Dr. Woodbury's office, the latter called in Dr. Balcolm and Dr. Hardy, co-defendants, asked them what they thought it looked like to them, and stated: "Frankly, I am stumped, I don't know what it is." Dr. Hardy and Dr. Balcolm discussed the matter, but used "medical phraseology," which plaintiff did not understand. At that time Dr. Woodbury mentioned several times that there were no hot water bottles in the delivery room. On May 18 she returned to the hospital, the bandages were removed and the leg redressed. The first dressings had been alum dressings—a soothing ointment having a zinc oxide base, a phenol antiseptic, and two or three other ingredients. After the doctor examined it the second time, the ointment was removed with merthiolate, and the doctor observed a reddish discoloration that looked like sunburn, and he had the alum dressings continued for another 24 hours thinking the condition was a skin irritation and would disappear in three or four days. To the doctor it did not have any appearance of a severe burn, except a sunburn. The doctor then ordered sulfathiazole applied. He saw the leg and dressed it practically every day and began to get alarmed, inquired again and again of everybody, without finding any reason for the condition. The skin started to die in spots, became gangrenous but, peculiarly, did not slough off. When she left the hospital the skin over the whole area had become necrotic and there was considerable pus draining off out of the wound.

There was no swelling and the pain had disappeared. Daily treatments continued at the hospital. There was no charge for medical fees for these treatments. A hot magnesium sulphate pack was used to get the skin to slough. A split skin draft was recommended by the doctor and performed. About two thirds of it did not take, but the wound was filling in. However, the plaintiff and her husband were dissatisfied with the progress of the condition and about June 18 demanded a skin specialist. None such was available, however, and after further discussion between the parties the plaintiff removed to the Las Vegas army airfield hospital for treatment, which treatment was continued until October 1944. The affected area responded to the treatment and eventually became covered with new skin. She has a scar however that will be permanent. She exhibited her leg without objection to the jury.

Two hot water bottles had been placed in the plaintiff's bed in her room to warm the bed for her return from the delivery room. After plaintiff had been returned to her bed and while she was still unconscious and was having glucose administered intravenously, she began to move and moan and the nurses asked her husband to try to keep her quiet. Her left leg became uncovered and he observed a large red area to which he called the nurse's attention. She examined the area and applied a bandage thereto, and removed a hot water bottle from the bed. Another nurse later removed another hot water bottle from the bed. The coverings wrapped and pinned on the bottles had come off one of these bottles. The husband referred to the leg condition as "a wound" and also as an "injury or wound." The doctor did not think it could have been an ether burn, or a burn from the pressure of the stirrups in the delivery room.

Defendants' counsel in his opening statement to the jury disclaimed responsibility for the "unfortunate injury" to the plaintiff's leg. Dr. Woodbury said "it

was a skin necrosis probably caused by a low grade infection." The condition was painful over a long period of time—until the first or second week in July 1944.

The nurses described the routine whereunder "we usually put hot water bottles in the bed so that the patient coming from the delivery room where it is warm will not go into shock when put into bed. Before the patient is placed in the bed, the bottles are removed." In fact a great deal of the testimony of the nurses was rather concerning "routine" than a recollection of what actually was or was not done in this particular case. The transcript discloses page after page of the testimony of the nurses and the doctor to the effect that everything was done under recognized methods of treatment and with due care and skill, and that nothing was omitted that afforded due protection and care for the plaintiff. Plaintiff disclaims any claim for damage growing out of improper, unskillful, or negligent treatment having to do with the actual birth of her child—whether on the part of the hospital or the doctor or any of the nurses. She predicates her claim for damage entirely upon the injury to her leg after she was removed to her room in the hospital from the delivery room. Her theory of her right to recover damages is based upon the fact that a burn, wound, or other injury to her leg was the result of a lack of the due care to which she was entitled in her care and treatment by the doctors and hospital employees after the birth of her child; that when she entered the hospital her leg was in all respects normal and that the damage was to a well and healthy portion of her body entirely independent of the purpose of her medical treatment and hospitalization. The nature of the treatment of her leg after the injury developed is shown by way of aggravation of the damage.

Under these circumstances she insists that she is entitled to the application of the doctrine of res ipsa loquitur, and that by reason thereof was not required to prove any specific acts of negligence on the part of

the defendants. Appellants, on the other hand, insist that specific acts of negligence must be alleged and proved and that the doctrine of res ipsa loquitur does not apply. Although other errors are urged, a determination of this question will be largely determinative of the appeal. Although the propriety of applying the doctrine has led to many appeals, the nature of the doctrine itself has been recognized by all of the courts for a great many years. From the opinions of such courts there has developed a series of definitions which, while couched in varying language, clearly define the nature of the doctrine.

"While the mere fact of an injury will not give rise to a presumption of negligence on the part of anyone, under the doctrine of res ipsa loquitur, an expression which means, literally, the transaction speaks for itself, the facts or circumstances accompanying an injury may be such as to raise a presumption, or at least permit an inference, of negligence on the part of the defendant. The conclusion to be drawn from the cases as to what constitutes the rule of res ipsa loquitur is that proof that the thing which caused the injury to the plaintiff was under the control and management of the defendant, and that the occurrence was such as in the ordinary course of things would not happen if those who had its control or management used proper care, affords sufficient evidence, or, as sometimes stated by the courts, reasonable evidence, in the absence of explanation by the defendant, that the injury arose from or was caused by the defendant's want of care. Hence, the occurrence of an injury under the circumstances as set forth permits an inference, or in the terminology of some courts, raises a presumption, that the defendant is guilty of negligence. It has been said that the phrase 'res ipsa loquitur' is a symbol for the rule that the fact of the occurrence of an injury, taken with the surrounding circumstances, may permit an inference of culpability on the part of defendant, make out plaintiff's prima facie

case, and present a question of fact for defendant to meet with an explanation. In the language of a leading case, 'where the circumstances of the occurrence that has caused the injury are of a character to give ground for a reasonable inference that if due care had been employed by the party charged with care in the premises, the thing that happened amiss would not have happened,' negligence may fairly be inferred in the absence of any explanation.

"As indicated by the cases cited throughout this and the succeeding sections, as well as in other articles of this work dealing with the application of the doctrine to particular relations and in actions for particular injuries, the res ipsa loquitur doctrine is accepted almost universally by the courts of this country."

The above definitions occur in 38 Am.Jr. 989, with citations from almost every state in the union (not including Nevada) and from the United States supreme court and various circuit courts. The text goes on to say further:

"The doctrine of res ipsa loquitur, which means, literally, the transaction speaks for itself, is merely a rule of evidence, not a substantive rule of law. On the other hand, it has been said that the doctrine, strictly speaking, merely takes the place of evidence as affecting the burden of proceeding with the case, and is not itself evidence. The doctrine is not a rule of pleading, but rather an inference aiding in the proof. It is peculiar to the law of negligence and is an exception to the general rule that negligence is not to be presumed, but must be affirmatively proved. The res ipsa loquitur rule has been said to be a qualification rather than an exception to the general rule of evidence that negligence must be affirmatively proved, in that it relates to the mode, rather than the burden, of establishing negligence. Res ipsa loquitur creates an inference or presumption of negligence that constitutes evidence of negligence which may not be disregarded by the jury, or court sitting

without a jury, but is to be weighed and considered as against the evidence adduced by the defendant in rebuttal thereof. However, the doctrine does not require the jury to find in favor of the plaintiff, but merely affords evidence to carry the question of liability to the jury, which may adopt or reject the conclusion of responsibility on the defendant's part as required by their reason and common sense, applied to all the facts in the case.

"The res ipsa loquitur doctrine is based in part upon the theory that the defendant in charge of the instrumentality which causes the injury either knows the cause of the accident or has the best opportunity of ascertaining it, and that the plaintiff has no such knowledge, and therefore is compelled to allege negligence in general terms and to rely upon the proof of the happening of the accident in order to establish negligence. The inference which the doctrine permits is grounded upon the fact that the chief evidence of the true cause, whether culpable or innocent, is practically accessible to the defendant but inaccessible to the injured person. If the circumstances do not suggest or indicate superior knowledge or opportunity for explanation on the part of the party charged, or if the plaintiff himself has equal or superior means of information, the doctrine will not apply."

The doctrine has in many cases been applied to situations quite similar to the present one. In Meyer v. McNutt Hospital, 173 Cal. 156, 159 P. 436, Melvin J. said:

"Plaintiffs sued on account of injuries caused, as alleged, by the carelessness of defendant's employes in allowing Bessie Meyer to be badly burned upon the legs by a hot water bottle while she was unconscious from the effects of an anæsthetic administered to her before a surgical operation was performed upon her. * * *

"It appears from the evidence that Mrs. Meyer, upon the advice of her physician, went to the defendant's hospital. She was put to bed; subsequently was taken

to the operating room; was placed under an anæsthetic; was subjected to an operation; and did not regain consciousness until after she had been returned to her bed. Mrs. Meyer testified that there were no burns or injuries of any sort upon her legs when she entered the hospital, nor up to the time when she lost consciousness. When she regained her senses she suffered pain and complained to her nurse, who found blisters upon the patient's legs. The injuries were treated as burns usually are and yielded to the treatment. The surgeon who performed the operation testified that she was not burned while in his presence; and, while there was no direct testimony to the effect that any servant of McNutt hospital had applied hot water bags or any other instrumentality to produce the injuries upon Mrs. Meyer, we think the jury was justified in determining from all of the circumstances that the burns were inflicted while the patient was unconscious and under the exclusive care of defendant's nurses. The nature of the injuries themselves tends strongly to support this conclusion. Areas of 24 square inches on one leg and 15 on the other were affected, and it seems hardly possible that one could be so burned while conscious without realizing it. * * * Miss Smith, a nurse, who had charge of Mrs. Meyer before and after the operation, testified that sometimes hot water bags were put in the beds of patients before they were brought back from the operating room. * * * Dr. Johansen * * * testified that within his experience it was customary to have the bed warmed, and that he had abundant experience. He said that a bed was usually warmed by using hot water bottles. * * *

"The doctrine res ipsa loquitur is properly applied to the facts of this case. The patient was unconscious. Under its contract with her the defendant corporation owed her a duty of protection which was violated by the use of an instrumentality which produced the painful results which were made manifest when she came out from the influence of the anæsthetic. Proof of the

accident carried with it the presumption of negligence. Judson v. Giant Powder Co., 107 Cal. 549–555, 40 P. 1020, 29 L.R.A. 718, 48 Am.St.Rep. 146; Housel v. Pacific Electric R. Co., 167 Cal. 245, 139 P. 73, 51 L.R.A.,N.S., 1105, Ann.Cas. 1915C, 665. And this is the rule whether the liability be ascribed to the carelessness of experienced nurses or to defendant's negligence in selecting nurses who were not competent. That is the true rule as announced in Adams v. University Hospital, 122 Mo.App. 675, 99 S.W. 453, a case very like the one at bar."

Many other cases are to similar effect, with the facts in some of them peculiarly in point. It is unnecessary to quote from these decisions. See Timbrell v. Suburban Hospital, 4 Cal.2d 68, 47 P.2d 737; McBride v. Clara Barton Hospital, 75 Cal.App. 161, 241 P. 941; Brown v. Shortlidge, 98 Cal.App. 352, 277 P. 134; Ybarra v. Spangard, 25 Cal.2d 486, 154 P.2d 687, 162 A.L.R. 1258 (reversing the same case in Cal.App., 146 P.2d 982, in which the district court of appeals had held that the doctrine did not apply); Ales v. Ryan, 8 Cal.2d 82, 64 P.2d 409; Maki v. Murray Hospital, 91 Mont. 251, 7 P.2d 228.

It is clear from the foregoing cases and many more to like effect that the learned district judge was correct in instructing the jury on the doctrine of res ipsa loquitur, and that appellant's assertion of lack of proof of any acts of negligence is without weight. The opening and closing briefs of appellants (the case was submitted without oral argument) quoted at great length from the testimony of the nurses and of Dr. Woodbury, and insist that the jury should have accepted such testimony and that the trial court should likewise have accepted such testimony on the motion for new trial. It is elementary, however, that this was a matter for the jury in the first instance and for the trial court in the second. We cannot say that the jury was wrong in rejecting the testimony adduced by the defendants to the effect that the water used to fill the bottles was not hot

enough to cause the injury, that the bottles were so wrapped and double-wrapped and secured to render them absolutely safe, that the injury was thought not to be a burn, that it was caused by the husband's massaging of his wife's leg, that her condition might have been "milk leg," etc. Nor are we impressed with the insistence of appellants that the jury should have concluded of their own knowledge that the injury could not have been caused by a burn from a hot water bottle. Appellants insist that "the judge should have taken judicial notice of the fact that a hot water bottle could never burn an area as extensive as that claimed," and that a jury "could not accept" a burn of this extent as having been caused from a hot water bottle; that "the court could well have taken judicial notice of the fact" that even if the bottle had been hot enough in the first instance it would have cooled off by the time the patient was placed in the bed; "that it was the province of the trial court to have known * * * and taken judicial notice of the fact that the condition could have been caused by a blood stream infection entering the body days prior to delivery or due to an irritation due to the rubbing of plaintiff's leg by her husband"; that it may have been a subcutaneous infection; that "every day experience tells us that the blister would not have developed" so quickly if the condition had been a burn; "that it could have been anything"; that "the average lay person knows as a matter of experience" that blisters from a burn do not form as they did here; that the condition "would negative in the mind of any layman that it was a burn." It is manifest that if the jury and the trial judge had the right, of their own knowledge, to determine, as appellants insist they had, that the condition was not a burn but the result of causes other than a burn, they had the same right to use their common knowledge to conclude the contrary, which is apparently what they did.

Appellants set out verbatim in their briefs

many of the instructions given by the court, and assert
that the trial court erred in refusing to grant the motion
for new trial, for the reason that the jury's verdict was
not in accordance with such instructions. It is not
claimed that the instructions were given in error. It is
apparent indeed that they were given at the request
of the defendants. It is conceded that such instructions
correctly stated the law. The object of appellants'
attack is the jury's finding of fact. The trial judge was
acting entirely within his province in refusing to inter-
fere with that finding.

It is claimed that the court erred in refusing to give
an instruction for a directed verdict for the defendants.
There is no merit in this contention. It is also urged
that the court erred in refusing to find that the verdict
for $5,000 was excessive, and that it was the result of
passion or prejudice. We likewise find no merit in this
contention.

■ There is some confusion as to the actual parties
defendant pursuant to the proceedings on the motion to
amend the complaint at the conclusion of the plaintiff's
case. The original complaint had named as defendants
"Las Vegas Hospital Association, Incorporated, a corpo-
ration; C. W. Woodbury, John Doe, Jane Doe; John
Doe and Jane Doe, co-partners; John Doe Company, a
corporation; Richard Roe and Jane Doe." The com-
plaint alleged that the object of the corporation was to
maintain the hospital at Las Vegas, and that Dr. Wood-
bury maintained his office at the hospital, and alleged
negligent treatment of the plaintiff, or lack of sufficient
care, on the part of Dr. Woodbury, the corporation and
its employees. After the overruling of the demurrer to
the complaint, an answer was filed on behalf of "C. W.
Woodbury, and C. W. Woodbury, Stanley L. Hardy,
John R. McDaniel, Jr. and R. D. Balcolm, a co-partner-
ship," which answer alleged the dissolution of the corpo-
ration prior to the commencement of the action and
"that at the times mentioned in the plaintiff's complaint

defendant C. W. Woodbury was, and now is, a member of a co-partnership composed of C. W. Woodbury, Stanley L. Hardy, John R. McDaniel, Jr. and R. D. Balcolm," all duly licensed physicians, etc.

At the conclusion of the plaintiff's case the following occurred:

"By Mr. Cope: At this time our medical witness is not present, but I would ask permission of the Court to amend the complaint filed herein. It is alleged that the Las Vegas Hospital Association, Inc., a corporation, at all times herein mentioned was and now is a corporation organized and existing under and by virtue of the laws of the State of Nevada; that the principal objects and purposes for which the corporation was formed and for which its existence is continued, were to maintain a hospital in the City of Las Vegas, Nevada. The answer * * * states that they deny the allegations * * * and allege that the co-defendant, Las Vegas Hospital Association, Inc., was dissolved prior to the commencement of the action * * * that at the time mentioned * * * defendant, C. W. Woodbury was and now is a member of a co-partnership of C. W. Woodbury, Stanley L. Hardy, John R. McDaniel, Jr., and R. D. Balcolm all and each of whom are physicians, etc. At this time we would make the motion that wherever in the complaint the word 'Las Vegas Hospital Association, Inc., a corporation' appears that there be substituted in lieu thereof 'a co-partnership composed of C. W. Woodbury, Stanley L. Hardy, John R. McDaniel, Jr. and R. D. Balcolm.'

"By The Court: Is there any objection? Counsel for the plaintiff has asked leave to amend his complaint in accordance with your answer is the substance of it.

"By Mr. Morse: We have no objection. Not amendment, a substitution of the parties in accordance with our answer. However, there is no appearance of the Las Vegas Hospital Association, Inc. That would be affirmatively alleged. That was dissolved prior to this action. The answer is in behalf of C. W. Woodbury and a co-partnership, an alleged co-partnership. We

make no allegation whatever as to the hospital. If I am in error in that, please correct me.

"By Mr. Cope: I think you answer, sir, for C. W. Woodbury and C. W. Woodbury, Stanley L. Hardy, John R. McDaniel, Jr. and R. D. Balcolm, a co-partnership. I think you answer individually and collectively, sir.

"By Mr. Morse: That is correct. We have no objection to that being substituted for the John Doe partnership.

"By the Court: That is what you actually asked leave to do, isn't it? Substitute the co-partnership named in place of the John Doe, Jane Doe co-partnership?

"By Mr. Cope: The four names as co-partners doing business as the—I do not think they state as Las Vegas Hospital Association.

"By Mr. Morse: No, we do not.

"By Mr. Cope: I would ask leave to substitute those in the fictitious names named in the complaint, sir, to-wit, C. W. Woodbury, Stanley L. Hardy, John R. McDaniel, Jr. and R. D. Balcolm, a co-partnership.

"By the Court: There being no objection, the motion will be granted."

The result of the foregoing stipulation and order was simply to dismiss the nonexistent corporation as a defendant and to join the co-partnership, or, as appellants' counsel put it, "a substitution of the parties in accordance with our answer." Immediately following, defendants moved for a nonsuit, which was granted as to Las Vegas hospital association, incorporated, but was denied as to the individual defendants "as a partnership." It is the view of the plaintiff that the amendment substituted the partnership for the corporation, in which event all allegations as to negligence on the part of "its employees" would become similarly applicable. It is the view of the defendants that the complaint clearly intended to charge the nurses as the employees of the corporation and that the amendment substituted the copartnership for the fictitious defendants named, and that the complaint does not charge the nurses as

employees of Dr. Woodbury or of any of the fictitious defendants for which the partnership was substituted. However, the appellants themselves assert, in their opening brief: "All the nurses who have been shown to have been on the scene at the time of delivery of the plaintiff's child * * * and who attended the plaintiff in her room, were employees of the 'Las Vegas Hospital Association.'" Nurse Kennedy testified to her employment by "the Las Vegas Hospital Association." Nurses Barrett and Clark testified to their employment by "the Las Vegas hospital." There is strangely absent from the entire case any actual evidence that the business of conducting the hospital was continued by the association or partnership after the dissolution of the corporation. Yet the answer of the defendants alleging the copartnership would otherwise appear to be entirely vain and meaningless. Indeed, the appellants recognize the situation as "an attempt" to bring in the hospital association in lieu of the corporation. Examination and cross-examination of the plaintiff, of her husband, or of any of the nurses failed to elicit any objections upon the ground of the failure to indicate that the partnership was conducting the affairs of the hospital. Virtually every witness including Dr. Woodbury and the nurses themselves testified as to what the various nurses did, and no objection or suggestion was made by the defendants that the nurses were not employees of the defendant copartnership which the defendants themselves had set up in their answer. On several occasions defendants' counsel conceded that the nurses, or some of them, were employees "of the hospital." Testimony on the part of Dr. Woodbury indicated his authority in several hospital matters. The transcript does not indicate that either the motion for nonsuit or any requested instructions on behalf of the defendants, or the motion for new trial relied particularly upon this point. The motion for nonsuit was "directed specifically to the allegation of negligence."

In some of the instructions requested by defendants and given by the court, reference is made to possible negligence on the part of "either or both of the defendants," which the jury could only take to mean Dr. Woodbury or the copartnership. Even after the substitution of parties, defendants permitted instruction No. 41 to stand. This instructed the jury as to the verbatim allegations of negligence appearing in the complaint and that the jury must find for the defendants in failure of proof. The instruction contained the original allegations of negligence on the part of Las Vegas hospital association, incorporated, its servants, agents, and employees and could refer, after the substitution, only to the partnership. Indeed, the jury was further instructed, apparently at the request of defendants, that the only parties (following the "nonsuit") were Dr. Woodbury and the partnership. One of the movants for a new trial was Las Vegas hospital association, incorporated. The receipts for payments made by plaintiff, both after and before the delivery of the baby, were all stamped "Las Vegas Hospital Association." These association bills, duly receipted, included both the doctor's bill and the hospital charges.

The entire situation indicates the substitution of the partnership or association as a party defendant in place of the corporation. References in the pleadings, instructions and elsewhere to the servants, agents, and employees of the corporation would automatically apply to the servants, agents, and employees of the partnership or association. It is nowhere indicated that any other corporation, copartnership, association or entity was conducting the affairs of the hospital other than the personal defendants who appeared and answered individually and as copartners. It would be an improper exercise of the function of this court to refuse to consider the case on its merits because of any determination of this point adversely to the respondents thus raised for the first time on appeal.

The court has given consideration to the numerous cases cited by appellants with reference to the general rules of pleadings and proofs required in negligence cases. Under our conclusion that the rule of res ipsa loquitur was correctly applied, those cases are not deemed to be in point. We have also given due consideration to the discussion by appellants of the cases in which the doctrine was applied and to the attempt on the part of appellants to distinguish those cases, as for example the cases in which the "thing" or "agency" or "instrumentality" that caused the injury was known, but we do not consider the distinctions pointed out as affecting the applicability of the doctrine to the facts in this case. Other errors claimed by the appellants have likewise been considered, but are found to be without merit.

The judgment and orders appealed from are affirmed, with costs.

ON PETITION FOR REHEARING

July 15, 1947.

*Per Curiam:*

Rehearing denied.